## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CRISTAL McKNIGHT,                              :
                                              :
                    Plaintiff,                :
                                              :
            v.                                :        **OPINION**
                                              :        **Civ. Action No. 04-6116 (WHW)**
JO ANNE B. BARNHART                           :
COMMISSIONER OF SOCIAL SECURITY,              :
                                              :
                    Defendant.                :
                                              :

**Walls, Senior District Judge**

Plaintiff Cristal McKnight seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the final determination of the Social Security Commissioner ("Commissioner") that she was not entitled to Social Security disability benefits. This Court will affirm the Administrative Law Judge's ("ALJ") decision to deny Mrs. McKnight disability benefits.

## BACKGROUND

**A.      Procedural History**

Plaintiff applied for disability insurance benefits on July 2, 2002. (R. 20.)[1] The application was denied initially and on reconsideration. At plaintiff's request, the ALJ conducted a hearing to review her application on August 11, 2003. (R. 20.) The ALJ determined that plaintiff suffered from a severe impairment, but retained the residual functional capacity for sedentary work. (R. 24.) The ALJ found that plaintiff's past relevant work as a

_____

[1] References to the official administrative record filed with the Court on May 23, 2005 will hereinafter be made by the following citation (R. #.); # represents the page number at the administrative record.

customer service representative or a receptionist did not require performance of work-related activities precluded by her residual functional capacity. (R. 24.)  The ALJ also concluded that plaintiff's statements regarding her limitations were not completely credible.  (R. 22-24.) Plaintiff's request for review by the Appeals Council was denied on September 2, 2004.  (R. 9.) Upon review of additional information provided by plaintiff that was not presented to the ALJ, the Appeals Council still denied plaintiff review in a decision dated October 14, 2004 (R. 4.) The ALJ's decision then became the Commissioner's final decision.  (R. 4.)  Plaintiff timely commenced this action.

**B.     Personal and Employment History**

Plaintiff was 27 years old when symptoms of multiple sclerosis began to bother her on April 29, 2002.  Plaintiff claims that she became unable to work due to those symptoms on May 29, 2002.  Plaintiff has a ninth grade education and completed vocational training.  (R. 69.)  She is married and has two children.  (R. 72.)  Plaintiff worked continuously as a receptionist, though at different offices, from January 1998 until November of 2000.  She then worked as a customer service representative from March to July of 2001.  At the onset of her symptoms, plaintiff was working as a dishwasher in an elementary school and as a cashier at a local supermarket.  She quit both jobs in May of 2002, allegedly on account of her symptoms.  (R. 76.)  Plaintiff explained in her application for social security disability benefits that she was first diagnosed with "vertigo from possible ear infection" and "unexplained fatigue," which caused her to work fewer hours.  (R. 63.)  She stopped working shortly after that, claiming that she "felt unstable on my feet / went to emergency room received MRI." (R. 63.)  On the daily activity questionnaire portion of her application, plaintiff stated that her typical day involved chores, occasional

cooking, taking care of her children, and resting. (R. 73.)[2]  Plaintiff wrote that she is not able to

drive, but later testified at a hearing on August 10, 2003 that she drives to the supermarket,

church, and to do errands for her kids.  (R. 72, 258.)  She added that she avoids nighttime driving

because the glare from other cars' headlights makes it difficult for her to focus on the road.  (R.

258.)  Plaintiff testified that at least four times a weak she cannot get out of bed before 12-1pm.

(R. 256.)  However, she stated that she could get up if she had to (e.g. for a doctor's

appointment) but could not "do something long-term," for example, "somewhere we have to

walk for a long time." (R. 257-58.)  Plaintiff states she has mood swings and difficulty

concentrating, and her husband testified that she experiences depression. (R. 259-60).

## C.    Medical History Before the ALJ Decision

Plaintiff was examined at University Hospital in Newark, NJ, on May 24, 2002, by an ER

physician after she was involved in a minor motor vehicle accident.  (R. 95.)  She had no

complaints of pain and was not injured. (R. 97.)  Mrs. McKnight was discharged that same day

in stable condition.  (R. 107.)  Plaintiff was next seen as an outpatient at St. Barnabas Medical

Center on May 30, 2002 and June 1, 2002.  (R. 110.)  On May 30, plaintiff complained of

dizziness and right side dullness.  (R. 112.)  An MRI of plaintiff's head lead to a diagnosis of

multiple sclerosis, but plaintiff "remained stable throughout the evaluation, with no evidence of

neurologic deficits." (R. 113.)[3]  When discharged, she "left at a steady gait."  (R. 115.)  Plaintiff

was admitted to Saint Barnabas Medical center again on June 1, 2002, with a diagnosis of right

---

[2] Mrs. McKnight completed this portion of the application on July 3, 2002.  (R. 73.)

[3] In particular, plaintiff was diagnosed with relapsing-remitting multiple sclerosis, which is the most common form of multiple sclerosis. (R. 207, 235).  Relapsing-remitting multiple sclerosis is characterized by "clearly defined flare-ups" which are "episodes of acute worsening of neurologic function," followed by "partial or complete recovery periods free of disease progression."  (R. 235.)

arm/leg numbness constituting a multiple sclerosis flare-up. (R. 121-28.)  Beyond those symptoms, plaintiff was characterized as "alert, cooperative, in mild distress" and her condition on discharge was stable. (R. 122.)   She was instructed in cane use and arranged follow-up appointments. (R. 123.)  Plaintiff was an inpatient at Clara Maass Medical Center from June 4, 2002 until June 10, 2002, where she was again diagnosed with a new onset of multiple sclerosis. (R. 131.)  A physical examination by Dr. Fatah during her time as an inpatient  revealed that she had "some weakness and tingling sensation on the right side." (R. 132.)  Lab tests revealed normal conditions with the exception of nonspecific T wave abnormality and an abnormal ECG. (R. 153.)  Plaintiff saw Dr. Michael Brand on June 12, 2002, who noted that at time of discharge, plaintiff's gait was smooth and she experienced no ataxia, though she was hyperventilating in the office.  (R. 160.)  Upon physical examination, Dr. Brand found plaintiff's strength to be "intact, fine, rapid, rhythmic movements unimpaired." (R. 160.)  Both Dr. Brand and Dr. Andrew Pachner, consulted for a second opinion, advised Mrs. McKnight to commence Rebif injections in July, 2002.  (R. 179-181.)  When seen by Dr. Brand for a second time on August, 28, 2002, plaintiff was in stable condition, felt better, walked smoothly, and was irritable. (R. 161.)  Dr. Brand advised her to continue her Rebif injections three times a week. (R. 161.)  On October 10, 2002, Dr. Nail Fatah reported that plaintiff complained of chest pains and anxiety.  (R. 192.)  Yet on November 20, 2002, plaintiff had no motor complaints or ataxia, and was in stable condition. (R. 179.)  Plaintiff stopped taking Rebif in November of 2002 because her copayments increased, according to Dr. Andrew Pachner.  (R. 182.)  By April 22, 2003, plaintiff had resumed taking the Rebif injections with Dr. Pachner. (R. 181.)

**D.     Medical History After the ALJ Decision**

After the ALJ's decision, plaintiff saw Dr. Avrim Eden, an ear specialist.  Dr. Eden reported on September 4, 2003, that plaintiff had "MS for past 15 months but doing well and on no treatment for past two months."  (R. 204.)  She did have "headaches and some photophobia and anxiety all related to her MS" with a "weaker right knee," but was negative for any other symptoms, physical as well as psychiatric.  (R. 204.)  Plaintiff reportedly returned from a hospitalization for acute vertigo and a new MRI showed an enhancing lesion on September 19, 2003. (R. 207.)  During a December 3, 2003 office visit with Dr. Pachner, plaintiff refused to take any medication that contained blood products on account of religious objections and agreed to start IV Solumedrol therapy.  Dr. Pachner characterized plaintiff as "confrontational." (R. 209.)  On January 1, 2004, Dr. Pachner reported that plaintiff was having no problem with Avonex injections and on May 14, 2004, stated that the MS was in remission.  Her next checkup was scheduled for four months after the visit.  (R. 213.)  On June 1, 2004, Dr. Pachner completed a residual functional capacity questionnaire, in which he found that plaintiff could sit for at least six hours in an eight hour working day and could stand/walk for about 2 hours.  Plaintiff would need to take unscheduled breaks every other day and would have to rest for ten hours "depending on injection days."  (R. 217.)  In Dr. Pachner's opinion, plaintiff could lift objects weighing less than ten pounds occasionally, and would have significant limitations with "repetitive reaching, handling, or fingering," though he did not indicate the percentage of time that plaintiff could perform these tasks during an eight-hour workday.  (R. 218.)  He predicted that plaintiff would likely miss work four times a month as a result of her illness.  (R. 219.)

## STANDARDS

### A.     Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. § 405 (g).  The district court must affirm the Commissioner's decision if it is "supported by substantial evidence." 42 U.S.C. § 405(g); Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir.1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir.1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 41 (1971) (quoting Conslidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court is not "empowered to weigh the evidence or substitute its conclusion for those of fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir.1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir.1984)).

In considering whether there is substantial evidence to support the Commissioner's decision, the reviewing court must examine: "(1) objective medical facts; (2) diagnoses and expert opinions of treating and examining physicians; (3) subjective evidence of pain; and (4) the claimant's educational background, work history, and age."  Snee v. Sec'y of Heath and Human Servs., 660 F.Supp. 736, 738 (quoting Blalock v. Richardson, 483 F.2 773, 776 (4th Cir.1972)).

### B.     Standard for the Commissioner's Determination of Disability

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A);

See also Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  The Social Security Act provides that:

> [an individual] shall be determined to be under disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A).

"In accordance with authority granted under 42 U.S.C. § 405(a), the Commissioner has

promulgated the regulations applied by the ALJ to give effect to, and further define the

provisions of the Act."  Knepp, 204 F.3d at 83.  The regulations provide for a five-step

evaluation of an individual's claim for disability and supplemental security income

benefits.  See Sullivan v. Zebley, 493 U.S. 521, 525, 110 S.Ct. 885, 888-89, 107 L.Ed.2d

967 (1990); see also Knepp, 204 F.3d at 83; Schaudeck v. Comm'r of Soc. Sec. Admin.,

181 F.3d 429, 431-32 (3d Cir. 1999).

In step one, the ALJ must determine whether the claimant currently engages in

substantial gainful activity. 20 C.F.R. §§ 404.1520(a) (1999); 20 C.F.R. §§ 407.1572,

416.972 (1999).  "Substantial gainful activity" is "the performance of significant physical

or mental duties...for remuneration or profit."  Chicager v. Califano, 574 F.2d 161, 163

(3d Cir. 1978).  If the claimant is not engaged in substantial gainful activity, the claim

analysis proceeds to step two.

In step two, the ALJ determines whether the claimant suffers from a severe

impairment or combination of impairments, which significantly limits the claimant's

physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c) and

416.920(c); see also Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982).  The burden is on the claimant to prove that his impairments are sufficiently severe to satisfy the standard.  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, (1987).

In step three, the ALJ must determine "whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity."  Yuckert, 482 U.S. at 141.  "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."  Id.; see also 20 C.F.R. §§ 404.1520(d), 414.920(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five, where the ALJ "must determine whether the claimant retains the ability to perform either his former work or some less demanding employment."  Heckler v. Campbell, 461 U.S. 458, 460 (1983).

In step four, the claimant must establish that he or she lacks the "residual functional capacity" to return to his or her former work.  20 C.F.R. §§ 404.1520(e); see also Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). "Residual functional capacity" is defined as what the claimant "can still do despite [his or her] limitations."  20 C.F.R. §§ 404.1545(a).  An ALJ must evaluate the physical and mental requirements of the claimant's past work experience to determine residual functional capacity.  See 20 C.F.R. §§ 404.1520(e); see also Knepp v. Apfel, 204 F.3d 78, 82 (3d Cir. 2000).  If the claimant can meet his or her past work demands, then he or she is not disabled within the meaning of the Act.  See Yuckert, 482 U.S. at 141, 107 S.Ct. at 229.  The claimant bears the burden of establishing steps one through four. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

In step five, the Commissioner must show that the claimant, given his or her age, education, and work experience, has the capacity to perform specific jobs that exist in the national economy.  See 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may rely on medical-vocational guidelines, commonly known as "Grids," such as those contained in 20 C.F.R. Subpart P, Appendix 2 for purposes of establishing whether a sufficient number of jobs exist for a person with claimant's diminished capacity.  See Heckler v. Campbell, 461 U.S. at 460, 103 S.Ct. at 1954.  The Commissioner bears the burden for the fifth step.  See Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

## ANALYSIS

In steps one and two of the analysis, the ALJ concluded that plaintiff was not involved in substantial gainful activity and that her multiple sclerosis was a severe impairment within the meaning of the Regulations.  (R. 22).  However, in step three the ALJ found that plaintiff's disability was not severe enough to meet or medically equal one of the impairments listed in the appendix pertaining to multiple sclerosis because "the claimant does not have disorganization of motor function or significant, reproducible fatigue of motor function with substantial muscle weakness or a severe visual or mental impairment," as listed in Appendix 1, Subpart P, Regulations No. 4 Listing 11.09.  (R. 22.)  At step four, the ALJ concluded that plaintiff retained the residual functional capacity for sedentary work, and could return to her previous employment as a customer service representative and receptionist.  (R. 23.)

Plaintiff challenges the ALJ's decision on three grounds.  First, plaintiff alleges that the ALJ failed to accord adequate weight to the opinion of her treating physicians.

Second, plaintiff claims that the ALJ erred in allegedly discrediting or failing to evaluate plaintiff's subjective complaints, testimony, and witness testimony.  Third, plaintiff asserts that the ALJ erred in his evaluation of plaintiff's residual functional capacity. (Pl.'s Br. at 2.)

**A.     The ALJ Accorded Adequate Weight to the Opinion of Plaintiff's Treating Physicians**

     1. *Evidence submitted before the August 26, 2003 decision*

Plaintiff argues that the ALJ failed to thoroughly discuss the findings of treating-physician Dr. Pachner and failed to inquire further about any physical or mental limitations of Plaintiff. Under the treating physician doctrine, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than the findings of a physician who has examined the claimant only once or not at all."  See Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985), Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).  The ALJ adequately discussed Dr. Pachner's findings in his report.  The ALJ did not question plaintiff's diagnosis of multiple sclerosis and recognized that plaintiff had complaints of "feeling off balance" and "blurry vision." (R. 22.)  The ALJ discussed the findings of treating physicians Pachner, Brand, and Fatah, all reiterating plaintiff's improved status since her first MS attack. (R. 22.)

The evidence of the treating physicians is internally consistent.  "If all of the evidence we receive, including all medical opinion(s), is consistent, and there is sufficient evidence for us to decide whether you are disabled, we will make our determination based on that evidence."  20 C.F.R. § 202.1527(c)(1).  The ALJ not only accorded adequate weight to the opinions of plaintiff's treating physicians, but relied on

and incorporated their medical judgment into his decision.  None of plaintiff's treating physicians opined that plaintiff could not perform sedentary work.  (R. 112-14, 122-125, 132, 160, 179.)

      2. *Evidence submitted after the August 26, 2003 decision*

Plaintiff argues that new and material evidence submitted at the Appeals Council level should be considered by this court.  Plaintiff submits that her degenerating condition after August 26, 2003 supports her position that the ALJ's decision was not supported by substantial evidence. The Third Circuit has "recognized that evidence first presented to the district court must not only be new and material but also be supported by a demonstration by claimant of 'good cause for not having incorporated the new evidence into the administrative record.'" Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001) (quoting Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)). The court elaborated:

> No statutory authority (the source of the district court's review) authorizes the court to review the Appeals Council decision to deny review.  No statutory provision authorizes the district court to make a decision on the substantial evidence standard based on the new and material evidence never presented to the ALJ.  Instead, the Act gives the district court authority to remand the case to the Commissioner, but only if the claimant has shown good cause why such new and material evidence was not presented to the ALJ.

Id. at 594.  The Matthews Court incorporated a Seventh Circuit decision concerning district court review of new evidence, in which the Seventh Circuit observed:

> It might seem . . . that the district judge and we would be free to consider the new evidence that was before the Appeals Council in deciding whether the decision denying benefits was supported by the record as a whole. And of course this is right when the Council has accepted the case for review and made a decision on the merits, based on all the evidence before it, which then becomes the decision reviewed in the courts.  It is wrong

when the Council has refused to review the case.  For then the decision
reviewed in the courts is the decision of the administrative law judge.  The
correctness of that decision depends on the evidence that was before him.
He cannot be faulted for having failed to weigh evidence never presented
to him. . . .

Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817-18 (7th Cir. 1993).

In Matthews and Eads, the plaintiffs attempted to introduce a report from a

vocational expert and a doctor's letter, respectively, after the ALJ's decision.  The

Appeals Council denied review, and in both cases the court properly did not consider the

post-hearing evidence.  Matthews, 239 F.3d at 594; Eads, 983 F.2d at 816-18.  Similarly,

Mrs. McKnight was already granted an opportunity to present additional evidence to the

Appeals Council, which denied review after making a determination that the evidence did

not pertain to the alleged time period of the disability.  (R. 4.)  Plaintiff has not shown

good cause why she failed to request a Residual Functional Capacity Questionnaire by

Dr. Pachner before the ALJ's August 26, 2003 decision.  It is also not clear that Dr.

Pachner's post-decision Residual Functional Capacity Questionnaire, even if considered

by the Court, supports plaintiff's position that she would be unable to perform sedentary

work.  Dr. Pachner reported that plaintiff could sit for at least six hours and stand or walk

for about two hours during an eight hour day, consistent with the guidelines for sedentary

work as discussed in section C.  (R. 214-17.)  Plaintiff's assertion that multiple sclerosis

is a "progressive disease" with periods of "waxing and waning" only further undermines

her position.  (Pl.'s Resp. Br. at 5).  Plaintiff's condition after the August 26, 2003

decision has no bearing on her state from May 29, 2002 to August 26, 2003 due to the

episodic and progressive nature of her illness, as the passage of time increases the

likelihood of another flare-up.  It follows that there was substantial evidence to support

the reasonable conclusion that plaintiff was in remission for much of the period in

question.  In conclusion, the ALJ accorded adequate weight to plaintiff's treating

physicians and the scope of the substantial evidence standard is properly limited to the

evidence before the ALJ at the time of his decision.

**B.      The ALJ Appropriately Evaluated Plaintiff's Testimony and Credibility**

Plaintiff argues that the ALJ erred in rejecting Plaintiff's subjective complaints

and testimony. The regulations indicate that in determining disability, a claimant's

subjective complaints serve as evidence of disability, when considered in light of

objective medical evidence.  See 20 C.F.R. § 404.1529(a) (2001).  The Third Circuit has

said that "where medical evidence does support a claimant's complaints of pain, the

complaints should then be given 'great weight' and may not be disregarded unless there

exists contrary medical evidence."  Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir.

1993).  The ALJ must consider "the entire case record, including the objective medical

evidence, the individual's own statements . . . , other information provided by treating or

examining physicians or psychologists and other persons about the symptoms and how

they affect the individual, and any other relevant evidence in the case record."  Mason,

994 F.2d at 1067.  According to the Social Security Rule 96-7p:

> When the existence of a medically determinable physical or mental
> impairment(s) that could reasonably be expected to produce the symptoms
> has been established, the intensity, persistence and functionally limiting
> effects of the symptoms must be evaluated to determine the extent to
> which the symptoms affect the individual's ability to do basic work
> activities.  This requires the adjudicator to make a finding about the

credibility of the individual's statements about the symptom(s) and its functional effects....The determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.[4]

1996 SSR LEXIS 4, *2-4.  The Social Security Administration elaborates:

One strong indication of the credibility of an individual's statements is their consistency, internally and with other information in the case record....However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms.

Id. at *15-16.

Plaintiff testified before the ALJ on August 11, 2003, that her right knee was very weak and that her vision is occasionally blurred.  (R. 249.)  She testified that she frequently has headaches, which she treats successfully with advil, and that she also experiences joint pains when she over-exerts herself.  (R. 250.)  Plaintiff told the ALJ that she becomes dizzy if she stands for too long and is tired "all the time."  (R. 251.)

---

[4] Factors in evaluating credibility include:

the medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and statements and reports from the individual and from the treating or examining physicians or psychologists and other persons about the individual's medical history, treatment, and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

1996 SSR LEXIS 4, at * 13-14.

She testified that she often does not get out of bed until 1 or 2pm, and that her kids get ready for school by themselves. (R. 251.)  Plaintiff's husband testified that fatigue was his wife's most evident symptom.  (R. 252.)  However, plaintiff later testified that she had good days where she doesn't "even think about the MS," but also has bad days: "There are days when I don't feel [fatigue], but somewhere during the day, I'm going to feel it." (R. 252, 259.)  In response to a question about what specifically would prevent her from returning to her work as a receptionist, plaintiff answered that it "would be very frustrating, dealing with people. . . .And just the getting up – just having to get up and go, knowing I have to get up and take care of my kids –"  (R. 256.)  When questioned by her attorney, plaintiff stated that she often does not get out of bed because she becomes "discouraged" because she knows she is going to be tired.  (R. 257.)  Plaintiff testified she would be able to function if she "absolutely had to get up," but could not go "somewhere we have to walk for a long time."  (R. 259.)  When asked if she could stand or walk for one or two hours a day, she responded that should would "get very cranky." (R. 260.)  Plaintiff testified of difficulty concentrating, resulting in frustration and depression.  Plaintiff's sleeping habits were normal.  (R. 260.)

    Plaintiff's testimony is both internally inconsistent and contradicts other evidence in the record.  At no point does plaintiff state that pain from her symptoms would prevent her from returning to work, instead she emphasizes her frustration with the condition in general.  The ALJ properly evaluated plaintiff's credibility when he concluded that her statements "are not supported by medical evidence of record" and that "she testified that she is able to drive and her sleep has been ok lately."  (R. 23.)  Although plaintiff's

complaints demonstrate classic symptoms of multiple sclerosis, her own testimony, as well as the record as a whole, reveals the mildness of her symptoms.[5]   The mildness of the symptoms, lack of documented complaints by treating physicians, and inconsistency of Mrs. McKnight's subjective complaints makes this case distinguishable from Claussen v. Chater, 950 F. Supp. 1287 (D.N.J. 1996), in which this Court found that the ALJ overlooked medical evidence supporting plaintiff's subjective complaints of fatigue from multiple sclerosis.  In Claussen, there were numerous "Progress Notes" documenting the plaintiff's fatigue level over the course of her treatment, in addition to a treating physician statement about her inability to perform sedentary work.  Id. at 1297.   Here, there is no similar documentation of plaintiff's fatigue level outside her testimony at the hearing and the disability reports she completed before appealing her case to the ALJ. (R. 63, 84, 88.)  There were no complaints of fatigue in any of her medical records, nor did any of her physicians comment on her ability to perform sedentary work.  Although the "absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility," the ALJ properly placed that factor in the context of all the evidence.  1996 SSR LEXIS 4, at *18-19.  The ALJ did not construe "a physician's silence as to a patient's pain as an affirmative statement that the patient is not in pain," as was disapproved of in Mason.  Mason, 994 F.2d at 1068.  Instead, the ALJ held that plaintiff's statements of pain are inconsistent.

---

[5] Early symptoms of multiple sclerosis include difficulty walking, numbness, dim or blurred vision, tremor, clumsiness, slurred speech, poor memory, feeling emotional, and difficulty thinking logically.  (R. 238-39.)

Coupling plaintiff's lack of credibility with numerous positive statements by plaintiff's

own treating physicians about her condition (including the absence of documented

complaints of fatigue), it follows that the ALJ's discussion of plaintiff's subjective

complaints is supported by substantial evidence.[6]  (R. 160, 179.)

**C.     The Medical Evidence Supports the ALJ's Finding that Plaintiff Retains the Residual Functional Capacity to Perform a Full Range of Sedentary Work**

Plaintiff argues that the ALJ did not supply rationale for his conclusion that

plaintiff retains the residual functional capacity for sedentary work.  'Residual functional

capacity' is defined as that which an individual is still able to do despite the limitations

cause by his or her impairments. SSR No. 96-8p, 1996 SSR LEXIS 5, at *5.  Residual

functional capacity "does not represent the *least* an individual can do despite his or her

limitations or restrictions, but the *most*."  Id.  The ALJ determined plaintiff had the

Residual functional capacity to perform "sedentary" work, which involves:

> lifting no more than 10 pounds at a time and occasionally lifting or
> carrying articles like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting, a certain amount of
> walking and standing is often necessary in carrying out job duties.  Jobs
> are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. 404.1567(a).  Determination of a claimant's residual functional capacity is the

exclusive responsibility of the ALJ.  20 C.R.F. § 404.1527(e)(2).  The ALJ must consider

---

[6] Plaintiff also contends that the ALJ did not address the testimony of her husband in his
decision.  However, the husband's testimony only corroborated the existence of plaintiff's
fatigue.  It did not provide the ALJ with information about other symptoms, or the progress and
severity of those symptoms.  The ALJ properly addressed the husband's testimony by
discrediting plaintiff own subjective complaints.

all relevant evidence when determining an individual's residual functional capacity.

Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

The ALJ supported his opinion with substantial evidence from the record.   In

addition to the cited doctors' reports and evaluation of credibility, the ALJ wrote: "At the

hearing Dr. Mellk testified that claimant has multiple sclerosis but she does not meet the

listing for that impairment. She has mild right side weakness but she can do sedentary

work."[7]  (R. 22.)  Dr. Mellk testified at the August 10, 2003 hearing that plaintiff could

sit for six to eight hours a day, stand or walk for two hours, and lift ten pounds on an

occasional or frequent basis.[8]  (R. 254.)  He mentioned that she might have some

_____

[7] A state medical consultant also filled out a Residual Functional Capacity Assessment in July of 2002.  Plaintiff argues that the ALJ erred in crediting the findings of this "non-treating, non-examining consultant" over the assessments of plaintiff's treating physicians.  (Pl.'s Br. at 17-18.)  However, there is no indication that the ALJ relied on the report in his opinion, in accordance with Third Circuit precedent on this issue.  (R. 17-24.)  The Third Circuit has advised that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."  Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).  Dr. Mellk's testimony is both more accurate and reflects the entirety of the medical evidence for the period in question, so the ALJ properly chose to give weight to Dr. Mellk's testimony concerning residual functional capacity instead of the state's report.  Plaintiff also argues that the state's report is invalid because the signature on the report was not legible, subjecting plaintiff to residual functional capacity assessment by an individual who, to the best of plaintiff's knowledge, may not be a licensed physician or possess the necessary expertise to appropriately evaluate plaintiff's condition.  (Pl.'s Resp. Br. at 1-2.)  Even if the report were considered by the ALJ, it is still of no consequence that plaintiff could not read the signature.  The purpose of the statutory signature requirement is not to identify the state medical consultant's qualifications, as plaintiff alleges, but simply to ensure that "the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided with respect to the history, examination and evaluation of laboratory test results."   20 C.F.R. §404.1519n(e).  The state medical consultant signed the report as required by 20 C.F.R. §404.1519n(e).

[8] Even if the Court considered Dr. Pachner's June 2004 Residual Functional Capacity Questionnaire, which it expressly declines to do, the report would still not aid plaintiff in determining residual functional capacity.  Dr. Pachner assessed that plaintiff could stand or walk

problems with fine manipulation or writing for long periods of time with her right hand, and that she should not engage in repetitive bending, stooping, and climbing.[9]  According to the SSA, however, limitations on repetitive bending, stooping, or climbing would not impact plaintiff's ability to perform sedentary work under the guidelines. 1996 SSR LEXIS 6, at * 21.

Plaintiff also argues that the ALJ did not consider non-exertional limitations involving manipulative functions in her right hand when evaluating her residual functional capacity.  This claim lacks merit.  According to SSR 96-7p, "when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  1996 SSR LEXIS 4 at *8.  Plaintiff never complained of any possible hindrance for repetitive manipulations. She did not

---

for about two hours and sit for at least six hours in an eight hour working day.  (R. 217.)  Dr. Mellk provided the same hourly ranges in his testimony when concluding that plaintiff retained the residual functional capacity for sedentary work.  (R. 254.)  Dr. Pachner's estimates are also consistent with the requirements of sedentary work as defined in 20 C.F.R. 404.1567(a).

[9] This particular portion of the transcript is cut off and reads, "Repetitive bending, stooping, climbing, [INAUDIBLE]."  Plaintiff alleges that this inaudible portion of Dr. Mellk's testimony constitutes a reversible error, relying on Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979), in which the entire record of a disability claim had been lost.  Here, a mere part of a sentence is inaudible, and it is easy to glean the missing portion from the context.  Since it follows other possible limitations on plaintiff's performance, it will be interpreted in a similar manner, favorable to plaintiff.  In fact, plaintiff alleges this interpretation in her brief.  (P.'s Br. at 11-12).  In order to make this assertion, plaintiff must have recalled the premise of the Dr. Mellk's testimony.  In any event, repetitive bending, stooping, and climbing are irrelevant to a determination that plaintiff can perform her past relevant work as a receptionist or customer service representative.

allege that she could not return to work due to difficultly typing or manipulating objects. The ALJ did not need to discuss repetitive manipulations to support his residual functional capacity assessment with substantial evidence.

Lastly, plaintiff claims that the ALJ erred in finding that plaintiff could return to her past relevant work as a receptionist or customer service representative. (Pl.'s Br. at 24-25.) A determination of past relevant work is a determination of the "physical and mental demands of jobs a claimant has performed in the past." S.S.R. 82-62. "The claimant is the primary course for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional and non-exertional demands of such work." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 123 (3d Cir. 2000). Plaintiff herself indicated that her work as a receptionist and a customer service representative required sitting for five to six hours, and standing or walking for one to two hours, and no lifting in a regular work day. (R. 80-82.) It follows that there was substantial evidence to support the ALJ's conclusion that plaintiff's residual functional capacity for sedentary work permitted her to perform her past relevant work as a receptionist or customer service representative.

## CONCLUSION

Because the ALJ accorded adequate weight to the opinions of Mrs. McKnight's treating physicians, appropriately evaluated her subjective complaints, and provided substantial evidence to support his conclusion that Mrs. McKnight retained the residual functional capacity for sedentary work, the Commissioner's decision is affirmed.

**s/ William H. Walls, U.S.D.J.**